**Michael Greenberg***
**McCarley Maddock***
**Benjamin A. Field***
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Ste. 900
Arlington, VA 22203-1854
Tel: (703) 682-9320
Email: mgreenberg@ij.org;
mmaddock@ij.org; bfield@ij.org

**Paul V. Avelar**
INSTITUTE FOR JUSTICE
3200 N. Central Ave., Ste. 2160
Phoenix, AZ 85012-1114
Tel: (480) 557-8300
Email: pavelar@ij.org

*Attorneys for Plaintiff Madrid*
*Admitted *Pro Hac Vice*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Fernando Madrid,<br><br>*Plaintiff*,<br>v.<br><br>Michael Whiting, individually and in his official capacity as Apache County Attorney; Daryl Greer; Trent Jensen; Apache County, Arizona; Apache County Attorney's Office,<br><br>*Defendants*. | Case No. 3:26-cv-08036-SMB<br><br>**PLAINTIFF'S OPPOSITION TO MICHAEL WHITING'S MOTION TO DISMISS (ECF 33)**<br><br>***Oral Argument Requested** |

# TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 2

ARGUMENT .......... 4

I. Fernie plausibly alleged that Whiting violated his constitutional rights .......... 4

A. Whiting directly suppressed Fernie's protected speech .......... 5

B. Whiting also unconstitutionally retaliated against Fernie for his protected speech and singled him out for "enforcement" in violation of the Equal Protection Clause .......... 7

C. Whiting erroneously conflates standing with the merits .......... 10

II. No immunity doctrine entitles Whiting to individual-capacity dismissal .......... 11

A. Eleventh Amendment immunity .......... 11

B. Absolute immunity .......... 12

C. Qualified immunity .......... 13

III. Neither the *Monell* doctrine nor the Eleventh Amendment bars the official-capacity claims .......... 15

A. *Monell* .......... 15

B. Eleventh Amendment .......... 16

CONCLUSION .......... 17

CERTIFICATE OF SERVICE .......... 19

# INTRODUCTION

Defendant Michael Whiting was the longtime County Attorney in Apache County. He did not like that Plaintiff Fernando ("Fernie") Madrid, a longtime Apache County educator, challenged the incumbent Superintendent of Schools—Whiting's wife—for election. Rather than let the race play out at the ballot box, Whiting orchestrated a weekslong intimidation campaign to force Fernie to drop out. Using the resources (including employees) of his office, Whiting had Fernie surveilled and assaulted; had rocks thrown at Fernie's home; and had an anonymous, extortionate letter threatening ruinous legal action and the dissemination of private information about Fernie and his family sent to Fernie's home. To end the harassment, Fernie dropped out of the race. Whiting now moves to dismiss Fernie's lawsuit seeking to redress these violations of his constitutional rights.

None of his arguments have merit. He begins by insisting that there is no constitutional protection for political campaigning. But his own cited cases explain that Fernie's campaign for superintendent is, in fact, ***core*** protected speech (**Part I.A.-B.**). And his attempt to turn his flawed merits argument into a standing defect is a non-starter (**I.C.**).

Whiting also argues that he is immune from suit even assuming he violated Fernie's rights, but those arguments likewise fail. He is not entitled to any immunity in his individual capacity—not under the Eleventh Amendment, because it does not protect individuals; not absolute prosecutorial immunity, because his actions have nothing to do with a prosecution in court; and not qualified immunity, because any reasonable official would have known he was violating Fernie's free-speech rights (**Part II**). Indeed, as if to spotlight the lack of merit in his attempt to evade accountability, Whiting's absolute-immunity argument relies principally on quotations he attributes to a Ninth Circuit case that we cannot find in the opinion he cites—or in any other opinion searchable on Westlaw or Lexis. *See* p. 13, *infra*.

It is unclear why Whiting moves to dismiss Fernie's claims against him in his official capacity at all. The official-capacity claims run against the government entities Whiting represented, not him personally, and those entities have already appeared by counsel and separately moved to dismiss. But for good measure, those claims are not barred either—not by the *Monell* doctrine, because Whiting acted as a ***policymaker*** for Apache County, not as a mere employee; and not by the Eleventh Amendment, because Whiting acted as a policymaker for ***the county***, not the State (**Part III**). The motion should be denied in full.

## BACKGROUND

Fernie was born and raised in Apache County and resides there now. ¶¶ 30, 33. (Paragraph and exhibit numbers cited throughout are citations to the complaint, ECF 1.) During his long career as an educator (mostly in Apache County), he specialized in helping to turn around underserved Native American schools. ¶¶ 34-39. He is mostly retired from teaching today, but he remains passionate about Apache County's students and schools. He's thus twice sought election as school superintendent. In 2016, he lost a close race. In 2024, he ran again. That time, his run for office ran into Whiting's intimidation campaign. ¶¶ 40-43.

By 2024, Whiting had long served as Apache County Attorney. ¶¶ 20-22. His wife, Joy, was the incumbent superintendent Fernie was challenging in 2024. ¶¶ 46-48. (She was not Fernie's opponent in 2016. ¶ 110.) Soon after Fernie started his campaign, Whiting orchestrated a concerted scheme to use his county attorney's office to intimidate, harass, and retaliate against Fernie—to force Fernie to drop his electoral challenge to Joy. ¶¶ 59-60.

The scheme played out over several weeks in March 2024, with Whiting directing two county attorney's office employees, Daryl Greer and Trent Jensen, to execute it. ¶¶ 23-29, 61. Taking orders directly from Whiting, and with a goal of intimidating Fernie out of his bid for office (¶¶ 164-71), Whiting's employee(s) surveilled and photographed both Fernie's property and Fernie as he moved about town. ¶¶ 66-73. They descended on Fernie's

property unannounced, refused requests to identify themselves, and attempted to leave strange documents with Fernie's son. ¶¶ 74-78. They approached Fernie as he was collecting ballot signatures, slammed his clipboard from his hands, forcefully pushed him in the chest and into the street, and verbally threatened that "Michael Whiting is just getting started with you." ¶¶ 80-92. They threw rocks at Fernie's home at nighttime. ¶¶ 93-96. And they sent sinister, anonymous letters (drafted by Whiting and paid for with his credit card), ominously threatening to subject Fernie to ruinous litigation and expose his family's personal information ***unless*** he dropped out of the race. ¶¶ 97-109.

These egregious actions were not just civil constitutional violations, but criminal: A grand jury indicted Whiting and one employee (Greer) for the intimidation campaign. ¶¶ 115-16, 127-28 & Ex. 1 at 2-5. The indictment also alleged various financial abuses of office by ***both*** Whiting spouses. ¶¶ 129-31 & Ex. 1 at 5-15. Greer pled guilty, admitting that he "knowingly aided and assisted" Michael Whiting in surveilling and photographing Fernie and sent Fernie the "lengthy threatening letter," all "in a concerted effort to deter" Fernie "from seeking political office in Apache County." ¶ 134. The charges against the Whitings remain pending. ¶ 135. Due to the indictment, Whiting's law license was suspended, and he no longer holds office as county attorney because the suspension makes him ineligible. ¶¶ 138-40.

Fernie sued to vindicate his rights in February. Whiting's intimidation campaign, he alleged, violated his constitutional rights to free speech and equal protection. ¶¶ 161-85, 202-10. Named as defendants are Greer and Jensen (the two County Attorney's Office employees), Apache County and its County Attorney's Office, and Whiting in both his individual capacity and official capacity as former County Attorney. (As detailed below, the official-capacity claims are just another method for naming the County and County Attor-

ney's Office.) The County and County Attorney's Office's separate motion to dismiss is fully briefed. ECF 21, 24, 26. Whiting, too, now moves to dismiss. ECF 33 ("Br.").

## ARGUMENT

### I. Fernie plausibly alleged that Whiting violated his constitutional rights.

"[D]ismissing a case at the pleading stage" is "disfavor[ed]." *United States ex rel. Adventist Health Sys. of W. v. AbbVie Inc.*, 169 F.4th 1137, 1142 (9th Cir. 2026). A motion to dismiss under Rule 12(b)(6) must be denied so long as the complaint's allegations "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Relief is plausible when there is a "cognizable legal theory" and "sufficient facts alleged to support" that theory. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

At the 12(b)(6) stage, courts "credit[] all factual allegations in the complaint as true and constru[e] the pleadings in the light most favorable to … the non-moving party." *Abbvie, Inc.*, 169 F.4th at 1142. So Whiting's idea that dismissal is warranted because Fernie has not yet "developed the facts," whether through an "affidavit," or the complaint's being "sworn or verified," or otherwise (Br. 12), is wrong. "A plaintiff need not prove the case on the pleadings to survive a motion to dismiss." *Norton v. Arpaio*, No. 15-cv-87, 2015 WL 13759956, at *3 (D. Ariz. Nov. 20, 2015) (citing *OSU Student All. v. Ray*, 699 F.3d 1053, 1078 (9th Cir. 2012)). Whiting's more limited charge that only "speculation" ties Whiting to "any" of Fernie's alleged misconduct (Br. 12) similarly fails. Fernie alleged that the intimidation campaign was carried out "at Michael Whiting's direction" (¶ 61) and provided specific details tying Whiting to the top of the scheme. *E.g.*, ¶¶ 88, 109. His allegations, after all, largely track the State's criminal indictment of Whiting for harassment waged against Fernie—as well as Greer's guilty plea admitting to "aid[ing] and assist[ing]" Whiting's "concerted effort to deter [Fernie] from seeking political office." ¶¶ 128, 134.

Fernie's allegations support three legal theories: direct suppression of Fernie's protected speech (¶¶ 162-67, 172-76); First Amendment retaliation (¶¶ 177-85); and an equal-protection violation because Whiting targeted Fernie's speech (¶¶ 202-08). To refute this, Whiting makes the extraordinary assertion that Fernie's political campaigning is not constitutionally protected at all. *See* Br. 2-3. So we begin by explaining that Whiting squelched protected activity, contrary to his suggestion that he was somehow regulating unprotected ballot access (**Section A**). That will also resolve whether Fernie has stated valid First Amendment retaliation and equal-protection theories (**B**). And last, we will rebut Whiting's conflation of standing with the merits (**C**).

### A. Whiting directly suppressed Fernie's protected speech.

"The First Amendment's protection of free speech has its 'fullest and most urgent application precisely to the conduct of campaigns for political office.'" *NRSC v. FEC*, 609 U.S. ----, ---- (2026) (slip op. at 6). At all stages, "the 'election campaign is a means of disseminating ideas as well as attaining political office.'" *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989). "[A] candidate's bid for elective office" thus constitutes a "'communicative act' protected by the first amendment." *Finkelstein v. Bergna*, 924 F.2d 1449, 1453 (9th Cir. 1991). So, plausible allegations that government officials suppressed that protected speech state a First Amendment claim. *Id*.

Fernie's complaint alleges that he was engaged in precisely these protected activities in March 2024. In seeking out the superintendent position, Fernie was "campaigning and communicating with the public" about his qualifications and "ideas for public education in Apache County." ¶ 147; ¶¶ 45, 56-58, 80-82, 151-52. His discussion of himself, his candidacy, and his ideas, and his attempts to recruit supporters, is "core political speech that warrants the highest protection under the First Amendment." ¶ 162. By directing the string of intimidating actions that were specifically designed to (and did) intimidate Fernie into

stopping that protected campaign activity, Whiting chilled Fernie's speech in violation of the First Amendment. ¶¶ 163, 165-67, 175. *See White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) ("Informal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' can violate the First Amendment also.").

Whiting doesn't contest that his actions were designed to (and did) suppress Fernie's campaign for office. He instead insists that the Constitution does not protect Fernie's campaigning: As Whiting sees it, "there is no constitutional right to run for office." Br. 2-3. But Whiting's cited cases aren't about restrictions on campaigning. They deal with challenges to administrative rules governing how and when people can appear ***on a ballot***. *E.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997) (analyzing whether political party "is absolutely entitled to have its nominee appear on the ballot"); *Lindsay v. Bowen*, 750 F.3d 1061, 1063-64 (9th Cir. 2014) (upholding secretary of state's decision to not "clutter and confuse [the] ballot" with candidate who admitted she was ineligible for the office); *NAACP v. Jones*, 131 F.3d 1317, 1322 (9th Cir. 1997) (failed challenge demanding, among other things, that candidates be allowed to "publish statements in the Sample Ballot" for free). Whatever First Amendment principles govern those cases, they do not govern "the conduct of campaigns," where First Amendment rights are at their zenith. *NRSC*, 609 U.S. at ---- (slip op. at 6). Indeed, Whiting's own cases contrast ballots, which are "not … forums for political expression," with broader "participation in the campaign," which is (as Fernie alleged) "a means of disseminating ideas." *Timmons*, 520 U.S. at 363; *Eu*, 489 U.S. at 223.

Fernie is not challenging a law regulating ballot-access rules. Nor was Whiting enforcing a legislatively enacted ballot rule in intimidating Fernie out of his campaign. Rather, he "harass[ed] and intimidat[ed]" Fernie in an effort to stop Fernie's "First Amendment-protected activity." ¶ 163. Or, as the Seventh Circuit has put it: "This is not a case where the plaintiff was denied access to the ballot as a result of the state's administration of a

facially neutral program regulating elections." *Newcomb v. Brennan*, 558 F.2d 825, 828 (7th Cir. 1977). "Instead it is a case where the plaintiff's candidacy was burdened because a state official wished to discourage that candidacy in particular." *Id*. Thus properly framed, Whiting's actions burdening (to put it mildly) Fernie's candidacy implicate "the core of the values protected by the First Amendment." *Id*. at 829.

### B. Whiting also unconstitutionally retaliated against Fernie for his protected speech and singled him out for "enforcement" in violation of the Equal Protection Clause.

Because the campaign activity Whiting suppressed is constitutionally protected, Whiting violated Fernie's rights in two additional ways: He retaliated against Fernie in violation of the First Amendment and denied Fernie equal protection.

**1. *Retaliation*.** The First Amendment prohibits otherwise-valid governmental actions that were in fact "motivated by retaliation for [the plaintiff's] having engaged in activity protected under the First Amendment." *Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019). "At the pleading stage," a valid retaliation claim "must simply allege 'plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct[.]'" *Id*.

In a single, unelaborated sentence, Whiting hints that his intimidation campaign might have been in service of his "duty to investigate voter fraud and take steps to ensure the orderly administration of elections." Br. 7; *see also id*. at 3 n.1 (suggesting, contrary to the complaint (¶¶ 33, 110), that Fernie was not an Apache County resident and thus not eligible to hold Apache County office). Even if Whiting did have some authority to pursue such concerns—more on that below—the complaint plausibly alleges that Whiting's "real motivation" was "to retaliate against Fernie for exercising his First Amendment right to run against Joy Whiting for Superintendent." ¶ 181; ¶¶ 177-85.

Retaliation claims have three elements. Plaintiffs must allege (1) they engaged in constitutionally protected expressive activity; (2) the government's actions would chill a person of ordinary firmness from that activity; and (3) the protected activity was a substantial or motivating factor—a but-for cause—of the government's actions. *Capp v. County of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019). Fernie detailed above (pp. 5-7) that the First Amendment protects his budding campaign for superintendent. And while Whiting doesn't dispute the other two elements—he argues only that Fernie's campaigning is not constitutionally protected at all—the complaint plausibly alleges those elements as well.

Whiting's weekslong intimidation scheme froze Fernie's campaigning for office, and it is plausible that ordinary people would have been similarly chilled. ¶¶ 175, 184. At Whiting's direction, Fernie faced surveillance and stalking (¶¶ 66-73), creepy visitors at his home refusing to identify themselves (¶¶ 74-78), a barrage of rocks thrown at his home (¶¶ 93-96), a physical assault (¶¶ 80-92), and creepy packages sent to his home (¶¶ 97-99). And Whiting's staffers warned that this accumulated intimidation was only the beginning. ¶ 88 ("Michael Whiting is just getting started with you."). Fernie got the message, and it was not unreasonable for him to self-censor as he did—to stop the "coercive tactics" and avoid placing himself or his family further in "harm's way." ¶¶ 100-01.

Fernie has also plausibly alleged that Whiting's motive for the intimidation campaign was retaliation for running against Whiting's wife, not evenhanded election-integrity concerns. ¶ 178. The Ninth Circuit's pleading standard for this element is liberal—"plaintiffs need only plausibly allege that retaliatory animus was a substantial or motivating factor to state a First Amendment retaliation claim that survives a motion to dismiss," *Capp*, 940 F.3d at 1058 n.6—and Fernie well clears the bar. After all, recall the history. Fernie ran for superintendent before, in 2016. Whiting was county attorney during both Fernie's 2016 and 2024 runs. Fernie's residency arrangement was the same in both his 2016 and 2024 runs.

Yet Fernie faced nothing like this in 2016, from Whiting or anyone else. The only thing that changed? In 2024, Fernie was running against Whiting's wife. Indeed, the complaint alleges that neither Whiting nor the county attorney's office under his leadership had taken ***any*** interest in candidate-eligibility matters ***until*** Joy Whiting faced an opponent. *See* ¶¶ 110, 113. *Cf. Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (explaining how "the fact that no one has ever been arrested for engaging in a certain kind of conduct" supports a retaliatory-arrest claim). It is at least plausible that Whiting's sudden concern for Fernie's 2024 run was "substantially motivated by" the fact that Fernie was challenging Whiting's wife—*i.e.,* by protected speech. *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016); ¶¶ 181-82.

And all of that is before getting into Whiting's cartoonishly "invalid" mode of purported enforcement. *Lacey v. Maricopa County*, 693 F.3d 896, 917 (9th Cir. 2012) (en banc) (special prosecutor's issuance of "broad, invalid subpoenas" to critical journalists and ordering their arrests without "warrants or other official approval" stated retaliation claim). Indeed, while Whiting implies that he was guarding against an "ineligible" candidate under his "duty … to ensure the orderly administration of elections" (Br. 3 n.1, 7), he nowhere explains what statute or ordinance he was purportedly enforcing. ***If*** Whiting "held a genuine concern over Fernie's eligibility for office," as he hints, "Arizona law provides a civil process for bringing eligibility challenges in court." ¶ 111. None of Whiting's tactics—"stalking, physical assaults, verbal threats, and extorting opponents to drop out"—resemble that (or any) lawful process. ¶ 112. That his conduct led to a criminal indictment for harassment makes that plain. *Cf. Gonzalez*, 602 U.S. at 676 (Jackson, J., concurring) (crediting Solicitor General's argument that use of "unusual, irregular" procedures is evidence of retaliatory intent). Put simply, there is no "'obvious alternative explanation' for [Whiting's] alleged

misconduct" other than its being retaliation for Fernie's protected speech. *Capp*, 940 F.3d at 1055. So Fernie "plead[s] a plausible First Amendment retaliation claim." *Id*. at 1058.

**2. *Equal Protection*.** Because Whiting squelched Fernie's speech where he would not do so (and had not done so) for similarly situated candidates ***not*** challenging his wife, Fernie has also stated an equal-protection claim. ¶¶ 202-10. "Government action that suppresses protected speech in a discriminatory manner may violate both the First Amendment and the Equal Protection Clause." *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 779 (9th Cir. 2014). For such claims, the two clauses "fuse[]": "Where plaintiffs allege violations of the Equal Protection Clause relating to expressive conduct," courts "employ 'essentially the same' analysis as … in a case alleging only content or viewpoint discrimination under the First Amendment." *Id*. at 780. Thus, both First Amendment theories detailed above equally support Fernie's stating an equal-protection claim against Whiting as well.

### C. Whiting erroneously conflates standing with the merits.

Fernie suffered injury-in-fact from Whiting's conduct. Whiting's actions "chilled Fernie's core political speech"; led to the time and resources Fernie spent campaigning being "wasted"; and caused Fernie emotional "pain and suffering." ¶¶ 143-60. Even so, Whiting argues that Fernie suffered no injury-in-fact and thus lacks standing because, Whiting says, the activity Whiting suppressed is not "constitutionally protected." Br. 3. But this reprised argument over the soundness of Fernie's legal theory "confuse[s]" Whiting's perception of "weakness on the merits with absence of Article III standing." *Arizona v. Yellen*, 34 F.4th 841, 853 (9th Cir. 2022); *see id*. (reminding that "standing 'in no way depends on the merits'"). The injuries Whiting inflicted on Fernie ***could*** be redressed by a judgment in Fernie's favor. Standing ends there; he "does not" lose it "just because his claims may fail on the merits." *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 834 (9th Cir. 2021).

## II. No immunity doctrine entitles Whiting to individual-capacity dismissal.

Whiting devotes much more briefing space toward arguing that, even if Fernie stated a claim, ***some*** immunity doctrine bars his suit. These arguments fail too.

Fernie sued Whiting "both in his individual capacity and in his official capacity" as the Apache County Attorney "during the events at issue here." ¶ 12. These are two different modes of recovery: The individual-capacity approach "seek[s] to impose ***personal*** liability" on Whiting; the official-capacity approach, in contrast, is "another way of pleading an action against [the] ***entity***" of which Whiting was "an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citation omitted; emphasis added). With that setup, we address Whiting's invocation of personal immunity here and his arguments for dismissing the official-capacity claims in Part III.

### A. Eleventh Amendment immunity

Whiting begins his tour through the immunity doctrines with "state immunity" under the Eleventh Amendment, Br. 4-6, but his argument is foreclosed twice over by *Hafer v. Melo*, 502 U.S. 21 (1991). First things first: "The Eleventh Amendment does not erect a barrier against … 'individual and personal liability' on state officials under § 1983." *Id*. at 30-31. So whatever the Eleventh Amendment says about the official-capacity claims (more on that in Part III), it is irrelevant to Fernie's right to recover against Whiting individually.

Whiting seeks to evade this bedrock principle. He seems to contend that the Eleventh Amendment bars the ***entire*** suit; as we understand the argument, he can't be held liable in his individual capacity because he was in truth "acting in his official capacity" when he violated Fernie's rights. Br. 4 (capitalization altered). But *Hafer* rejected this maneuver too. "[O]fficial capacity," the Court reasoned, refers "to the capacity in which the state officer is sued, not the capacity in which [he] inflicts the injury." 502 U.S. at 26. Section 1983's "under color of state law" requirement, after all, makes officials individually liable for

constitutional violations "precisely because of" their official authority. *Id*. at 27-28. Nor is there any support for the idea that individual- and official-capacity claims work as a see-saw; opting to press one in no way diminishes the right to pursue the other. *McMillian v. Monroe County*, 520 U.S. 781, 783-84 & n.1 (1997) (explaining that claims against sheriff in his individual capacity "proceeded independently in the lower courts" while official-capacity claims were decided on appeal). Only individual immunities ***could*** apply to Whiting individually (*see* Parts II.B.-C., below), and the Eleventh Amendment is no such thing.

**B. Absolute immunity**

Whiting asserts that he is entitled to the "absolute immunity" afforded to "[p]rosecutors performing their official prosecutorial functions." *Lacey*, 693 F.3d at 912; Br. 7-8. He is not. Prosecutors are not immune merely because they are prosecutors. Immunity attaches only when they act "in a prosecutorial role"—specifically those functions "intimately associated with the judicial phase of the criminal process." *Lacey*, 693 F.3d at 912-13. They are not immune for actions disconnected from their "advocacy" as "an officer of the court." *Id*.; *see Burns v. Reed*, 500 U.S. 478, 487 (1991) ("We have been 'quite sparing' in our recognition of absolute immunity" and "have refused to extend it any 'further than its justification would warrant.'" (citations omitted)).

Whiting does not explain how any of the specific actions in the complaint fit this framework—he nowhere concretely claims to have been doing anything "connected to the trial process," *Lacey*, 693 F.3d at 912—and that alone sinks his bid for immunity. "The official seeking absolute immunity bears the burden of demonstrating that absolute immunity is justified for the function in question." *Botello v. Gammick*, 413 F.3d 971, 976 (9th Cir. 2005); *see id*. at 977-78 (analyzing one-by-one whether prosecutorial immunity applied to three actions alleged to have violated plaintiff's rights). By not even trying to tie his alleged actions to the doctrine's function-by-function approach, Whiting fails to carry his burden.

Even if he had tried, his actions fall comfortably on the ***non***-immunized side of the line. It should go without saying that directing assaults on Fernie's home and person, and the sending of anonymous, extortionate letters, are not prosecutorial functions. ¶¶ 80-109, 164.d-f. These actions have no connection to "the judicial phase" of any proceeding; Whiting instead "side-stepped the judicial process" entirely. *Lacey*, 693 F.3d at 914 (denying absolute immunity to prosecutor who issued "grand jury subpoenas" without grand-jury involvement and ordered warrantless arrests "on his own authority"). As in *Lacey*, Whiting's intimidation campaign played out (to say the least) in an "aberrant nature … outside the judicial process," so absolute immunity does not protect it. *Id*.

Whiting's direction of the surveillance-like activities against Fernie (¶¶ 66-78, 164.a-c) bears separate mention. Not because they garner absolute immunity, to be clear. At best, those actions are akin to the "investigative," "evidence gathering" activities "normally performed by a detective or police officer"—and for such actions, "only qualified immunity is available." *Cousins v. Lockyer*, 568 F.3d 1063, 1068 (9th Cir. 2009).

Whiting relies almost entirely on a purported quotation from *Cousins* for the opposite proposition—that a prosecutor's "coordinating an investigation" ***is*** entitled to absolute immunity. Br. 8. But we have carefully reviewed *Cousins*, and much of the language Whiting attributes to that opinion simply does not appear in it. We do not know whether this is an AI hallucination or some other error, but the key quoted language is simply not there.

In any event, the misquote is also a misstatement of law. *Cousins* and countless other binding precedents are clear: "[W]hen prosecutors perform administrative or investigative functions, only qualified immunity is available." *Botello*, 413 F.3d at 975-76.

**C. Qualified immunity**

Whiting is not entitled to qualified immunity either, because the free-speech rights he violated were "clearly established" in March 2024. *Capp*, 940 F.3d at 1058. On the direct-

speech-restriction front, the Supreme Court's repeated admonition that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office" traces back over half a century. *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). And the Ninth Circuit established in 1991 that "[d]isciplinary action" meted out ***by a prosecutor*** "discouraging a candidate's bid for elective office 'represent[s] punishment by the state based on the content of a communicative act' protected by the first amendment." *Finkelstein*, 924 F.2d at 1453.

The impermissibility of ***retaliating*** against protected expressive activity is equally well-established. During Whiting's intimidation scheme, "it was clear ... that a government actor could not take action that would be expected to chill protected speech out of retaliatory animus for such speech." *Capp*, 940 F.3d at 1059 (denying immunity at motion-to-dismiss stage); *see also O'Brien*, 818 F.3d at 936 (discussing the "clearly established" "constitutional right to be free from retaliation," which "has long been prohibited by the First Amendment"). The fact that improper motive is a "necessary element" of a retaliation claim only underscores that every official should know that such retaliation is out-of-bounds. *See Koala*, 931 F.3d at 905; *Bloch v. Ribar*, 156 F.3d 673, 682-83 (6th Cir. 1998) (highlighting the "unlawful intent inherent" in retaliation and collecting cases from across the circuits).

Even without these directly-on-point cases clearly establishing the law, Whiting's invocation of qualified immunity fails for another reason. A plaintiff does not even need precedent with "facts closely analogous to [their own] case" so long as "any reasonable official" would have understood he was violating a constitutional right. *Capp*, 940 F.3d at 1058 (cleaned up). And Whiting's particular method of violating the First Amendment—directing assaults, rock-throwing, and extortionate letters to force out a rival candidate—is so obviously unlawful (indeed, it's criminal) that any reasonable official would understand it to traduce constitutional boundaries. *See Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (per cu-

riam) (confirming that "obvious" violations of rights are not immunized). Qualified immunity is about ensuring "fair warning" of unconstitutionality, *A.D. v. Cal. Hwy. Patrol*, 712 F.3d 446, 454 (9th Cir. 2013), and Whiting had plenty of it here.

### III. Neither the *Monell* doctrine nor the Eleventh Amendment bars the official-capacity claims.

As shown earlier, the official-capacity claims against Whiting run against the government entities Whiting represented when he violated Fernie's rights. Those entities—Apache County and its County Attorney's Office (together, the County)—have already filed their own motion to dismiss. ECF 21. Even so, Whiting himself advances two arguments against the official-capacity claims: (A) his actions were too "short lived" to support municipal liability (which the County already argued); and (B) the Eleventh Amendment bars County liability (which the County has not argued). Each lacks merit.

#### A. *Monell*

Like the County, Whiting says that his violations of Fernie's rights were too "isolated" to support municipal liability. Br. 10-12. He is wrong for the same reason the County was: Because Whiting was a policymaker, even one action is enough. *See* ECF 24 at 5-10.

As Fernie has already explained in response to the County's motion, municipalities "can be sued directly under § 1983"—just not under a respondeat superior theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). Rather, municipal liability attaches where the injury can "be ascribed to municipal decisionmakers." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985) (plurality). Courts often shorthand this as a requirement that the injury be caused by execution of a government "policy or custom." *Monell*, 436 U.S. at 694. In turn, that policy-or-custom requirement is satisfied with allegations that the injury was inflicted by an officer "whose edicts or acts may fairly be said to represent

official policy." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002). Under this "policymaker" path to liability, "the municipality is equally responsible whether th[e] [injurious] action is to be taken only once or to be taken repeatedly." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

Whiting acted as a policymaker for the County when violating Fernie's rights because the County Attorney "maintains final policymaking status" "for § 1983 purposes" and he "was directing his subordinate county attorney's office employees to carry out the intimidation campaign." ECF 24 at 6-8 (quoting *City of Phoenix v. Yarnell*, 184 Ariz. 310, 320 (1995)). *Monell* is thus no barrier to the official-capacity, municipal-liability claims.

### B. Eleventh Amendment

Whiting also errs in asserting that the official-capacity claims—which, again, run against the County, not him personally—must be dismissed as barred by the Eleventh Amendment. Br. 4-6. The County did not raise the Eleventh Amendment as cause for dismissal. ECF 21. The Court need go no further than that on the Eleventh Amendment at this stage; there is no reason to consider ***Whiting***'s argument for dismissing the County that the County ***itself*** chose not to raise. *Del Campo v. Kennedy*, 517 F.3d 1070, 1075 (9th Cir. 2008) ("an entity invoking Eleventh Amendment immunity bears the burden of asserting and proving" its applicability); *Aholelei v. Dep't of Public Safety*, 488 F.3d 1144, 1147 (9th Cir. 2007) ("Eleventh Amendment immunity … can be waived." (citation omitted)).

Even absent that backdrop, the Eleventh Amendment has no application here because Whiting was acting as a ***municipal*** policymaker, not on behalf of the state. ¶ 189. "States are protected by the Eleventh Amendment," but "municipalities are not." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989). Like many officials, Arizona county attorneys work for the State for some acts and their county for others. *See Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir. 2000) (explaining that this is common). Under Ari-

zona law, county attorneys act on the State's behalf "only" when "conducting prosecutions." *Altamirano v. County of Pima*, No. 15-cv-169, 2019 WL 3457696, at *6 (D. Ariz. July 31, 2019). "[F]or all purposes other than conducting prosecutions, [Arizona law] clearly indicates that the county attorney is an officer of the county." *Id.*; *see* ¶ 188. This Court has consistently drawn the same dividing line,* and Whiting cites no contrary case.

Whiting does not claim he was conducting a prosecution for the State in his alleged violation of Fernie's rights; indeed, he nowhere says what function he was carrying out at all. *See Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013) (state-versus-county "determination is made on a function-by-function approach"). As we have alleged (and argued before), he was directing the internal affairs of his office by directing his subordinates to violate Fernie's rights; his actions lacked any connection to a criminal prosecution. ¶¶ 61, 69, 72, 77, 89, 95, 109, 189-93; ECF 24 at 6-8. Such "supervision" of office employees is an "administrative" task for which a county attorney acts as a county official. *Milke v. City of Phoenix*, No. 15-cv-462, 2016 WL 5339693, at *17 (D. Ariz. Jan. 8, 2016). So the Eleventh Amendment's immunization for state governments plays no role here.

## **CONCLUSION**

Whiting's motion to dismiss should be denied in full.

---

* *Alley v. County of Pima*, No. 15-cv-152, 2024 WL 216773, at *17-18 (D. Ariz. Jan. 19, 2024) (the "County Attorney prosecutes public offenses on behalf of the State … but acts as a county official in other functions"); *Briggs v. Montgomery*, No. 18-cv-2684, 2019 WL 2515950, at *15-20 (D. Ariz. June 18, 2019) (analysis "turns on whether the [County Attorney] is performing a prosecutorial function or an administrative function"); *Milke v. City of Phoenix*, No. 15-cv-462, 2016 WL 5339693, at *16-17 (D. Ariz. Jan. 8, 2016).

DATED this 17th day of July 2026.

/s/ Michael Greenberg
**Michael Greenberg***
**McCarley Maddock***
**Benjamin A. Field***
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Ste. 900
Arlington, VA 22203-1854
Tel: (703) 682-9320
Email: mgreenberg@ij.org;
mmaddock@ij.org; bfield@ij.org

**Paul V. Avelar**
INSTITUTE FOR JUSTICE
3200 N. Central Avenue, Ste. 2160
Phoenix, AZ 85012
Tel: (480) 557-8300
Email: pavelar@ij.org

*Attorneys for Plaintiff Madrid*
*Admitted *Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2026, *Plaintiff's Opposition to Michael Whiting's Motion to Dismiss (ECF 33)* was served on Defendants Michael Whiting, Apache County, and Apache County Attorney's Office via the Court's e-filing system, and was served on Defendants Daryl Greer and Trent Jensen via email.

/s/ Michael Greenberg
Michael Greenberg
INSTITUTE FOR JUSTICE